No. 15-55630

# United States Court of Appeals
# for the Ninth Circuit

———

PATRICK MALONEY, on behalf of himself and all others similarly situated;
TIM JUDGE, on behalf of himself and all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

T3MEDIA, INC., a Colorado corporation, DBA Paya.com,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR CENTRAL CALIFORNIA, LOS ANGELES
HONORABLE ANDRE BIROTTE

## BRIEF FOR *AMICI CURIAE* ASSOCIATED PRESS, DIGITAL MEDIA LICENSING ASSOCIATION, GETTY IMAGES (US), INC., GRAPHIC ARTISTS GUILD, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, INC., PHOTOSHELTER, INC., PROFESSIONAL PHOTOGRAPHERS OF AMERICA, SHUTTERSTOCK, INC. AND ZUMA PRESS, INC.

NANCY E. WOLFF
COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP
*Attorneys for Amici Curiae Associated Press,*
*Digital Media Licensing Association, Getty*
*Images (US), Inc., Graphic Artists Guild,*
*National Press Photographers Association,*
*Inc., PhotoShelter, Inc., Professional*
*Photographers of America, Shutterstock, Inc.*
*and Zuma Press, Inc.*
41 Madison Avenue, 34th Floor
New York, New York 10010
(212) 974-7474

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* submit the following corporate disclosure statements:

1.      Associated Press states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

2.      The Digital Media Licensing Association states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

3.      Getty Images (US) Inc., a New York corporation that is not publicly traded, is wholly owned by other entities that are also not publicly traded. A majority interest of those not publicly traded entities is indirectly held by an affiliate of The Carlyle Group. The Carlyle Group L.P. is a publicly traded Delaware limited partnership.

4.      Graphic Artists Guild states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

5.      National Press Photographers Association, Inc. states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

6.      PhotoShelter, Inc. states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

7.    Professional Photographers of America states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

8.    Shutterstock, Inc. states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

9.    Zuma Press, Inc. states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................C-1

TABLE OF CONTENTS.............................................................................................i

TABLE OF AUTHORITIES ................................................................................. iii

IDENTITY AND INTEREST OF THE *AMICI CURIAE* .......................................1

ARGUMENT ............................................................................................................7

  I.   THE VISUAL CONTENT INDUSTRY SERVES AN
      IMPORTANT PURPOSE FOR PUBLISHERS, THE MEDIA,
      AND THE PUBLIC AT LARGE.....................................................................7

  II.  INDEPENDENT EXPRESSIVE VISUAL WORKS DO NOT
      VIOLATE THE RIGHT OF PUBLICITY AND CAN EXIST IN
      THE MARKETPLACE CONSISTENT WITH WELL-
      ESTABLISHED COPYRIGHT AND FIRST AMENDMENT
      PRINCIPLES ...............................................................................................11

      A.  Licensing a Visual Work or Offering It as an Art Print Is
          Distinct from Using the Visual Work in Connection with
          Merchandise or Advertising ...................................................................11

      B.  Appellants' Interpretation of the Right of Publicity Is
          Inconsistent with Copyright Law and the First Amendment ..................18

  III.  REVERSING THE DISTRICT COURT WOULD HAVE
      SIGNIFICANT CHILLING EFFECTS ON THE VISUAL
      CONTENT INDUSTRIES AS WELL AS THOSE THAT RELY
      ON LICENSED VISUAL CONTENT DEPICTING
      RECOGNIZABLE PEOPLE, SUCH AS THE MEDIA ..............................25

      A.  Permitting Right of Publicity Actions as Envisioned by
          Appellants Will Disproportionately Impact Visual Content
          Creators and Licensors, Art Print Services, and Those They
          Serve ......................................................................................................25

i

B.  Reversal of the District Court Will Affect How Visual Content
Is Offered Nationwide from Both Licensors' and Licensees'
Perspectives ..............................................................................................28

CONCLUSION .......................................................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Aldrin v. Topps Co.*,
No. 2:10-cv-09939, 2011 WL 4500013 (C.D. Cal. Sept. 27, 2011) .................15

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903).........................................................................................20

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884)...........................................................................................20

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
25 Cal. 4th 387 (Cal. 2001)..........................................................19, 20, 21, 30

*Dex Media W., Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) ...........................................................................15

*Downing v. Abercrombie & Fitch*,
265 F.3d 994 (9th Cir. 2001) ...........................................................................14

*Dryer v. Nat'l Football League*,
No. 14-3428 (8th Cir. Feb. 26, 2016) ...............................................................18

*Fleet v. CBS, Inc.*,
50 Cal. App. 4th 1911 (Cal. Ct. App. 1996)......................................................18

*Foster v. Svenson*,
128 A.D.3d 150 (N.Y. App. Div. 2015) .............................................................15

*Jones v. Corbis Corp.*,
815 F. Supp. 2d 1108 (C.D. Cal. 2011) .............................................................13

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952).........................................................................................16

*Laws v. Sony Music Entm't, Inc.*,
448 F.3d 1134 (9th Cir. 2006) ..........................................................................14

*Los Angeles News Serv. v. Tullo*,
973 F.2d 791 (9th Cir. 1992) ............................................................................21

*Maloney v. T3Media, Inc.*,
    94 F. Supp. 3d 1128 (C.D. Cal. 2015) ....................................................12, 13, 18

*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ...........................................................................21

*Montana v. San Jose Mercury News, Inc.*,
    34 Cal. App. 4th 790 (Cal. Ct. App. 1995) .........................................................16

*Sarver v. Chartier*,
    No. 11-56986, 2016 WL 625362 (9th Cir. Feb. 17, 2016) ................................22

*Timed Out, LLC v. Youabian, Inc.*,
    229 Cal. App. 4th 1001 (Cal. Ct. App. 2014) .....................................................13

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975) ............................................................................................16

*White v. City of Sparks*,
    500 F.3d 953 (9th Cir. 2007) .............................................................................12

*Winter v. DC Comics*,
    30 Cal. 4th 881 (Cal. 2003) ...............................................................................21

## Statutes

17 U.S.C. § 106 (2016) .............................................................................................18

Cal. Civ. Code § 3344 (2016) .........................................................................12, 16

U.S. Const. amend I ..........................................................................................*passim*

## Other Authorities

1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT §
    1.01[B][3][b][iv][II] (2014 ed.) ..................................................................13, 20

1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT §
    2.08[E][1] (2014 ed.) .........................................................................................21

2 J. Thomas McCarthy, THE RIGHTS OF PUBLICITY AND PRIVACY, §
    8.72 (2d ed. 2006) .......................................................................................*passim*

iv

*Product Information Glossary*, ART.COM,
   http://www.art.com/asp/customerservice/glossary-
   asp/_/posters.htm#q2 (last visited Feb. 26, 2016) ...............................9

Artist Weegee, INT'L CTR OF PHOTOGRAPHY,
   http://www.icp.org/browse/archive/constituents/weegee?all/all/all/
   all/1 (last visited Feb. 26, 2016) ........................................................17

Erik Wemple, *Washington Times Lays Off Staff*, WASH. POST, Jan. 4,
   2013, https://www.washingtonpost.com/blogs/erik-
   wemple/wp/2013/01/04/washington-times-lays-off-staff/ ...................9

Fred Bowen, *With Walter Looss, Sports Became Art*, WASH. POST
   (Nov. 25, 2009), http://www.washingtonpost.com/wp-
   dyn/content/article/2009/11/24/AR2009112403823.html ..................17

Kim Peterson, *Why Sports Illustrated Laid Off All of Its Photographers*,
   CBS NEWS, http://www.cbsnews.com/news/why-sports-illustrated-cut-all-of-
   its-photographers...............................................................................10

*License Agreements*, GETTY IMAGES,
   http://www.gettyimages.com/Corporate/LicenseAgreements.aspx
   (last visited Feb. 26, 2016)................................................................24

Mark Guarino, Wesley Lowery and Mark Berman, *Kalamazoo Police:
   Uber Driver's Alleged Rampage is 'baffling'*, WASH. POST (Feb.
   22, 2016), https://www.washingtonpost.com/news/post-
   nation/wp/2016/02/22/kalamazoo-shooting-rampage-suspect-set-
   to-appear-in-court-today/ ...................................................................26

Muhammad Ali Vs. Liston II, MORRISON HOTEL GALLERY,
   https://www.morrisonhotelgallery.com/set/default.aspx?setID=135
   0 (last visited Feb. 25, 2016) ............................................................17

Neil Leifer, ARTNET, http://www.artnet.com/artists/neil-leifer/
   (last visited Feb. 25, 2016) ................................................................17

*People*, N.Y. TIMES,
   https://www.nytimes.com/store/photos/people.html
   (last visited Feb. 26, 2016)................................................................17

Rachel L. Swarns ET AL., *Unpublished Black History*, N.Y. TIMES
    (Jan. 17, 2016),
    http://www.nytimes.com/interactive/projects/cp/national/unpublish
    ed-black-history/roy-campanella-at-ebbets-field-1960 ....................................23

Robert Channick, *Chicago Sun-Times Lays Off All Photographers,*
    CHI. TRIB. (May 31, 2013),
    http://articles.chicagotribune.com/2013-05-31/business/ct-biz-
    0531-sun-times-photographer-layoffs-20130531_1_sun-times-
    media-group-chicago-sun-times-timothy-knight..................................................9

*Statutes & Interactive Map*, RIGHT OF PUBLICITY,
    http://www.rightofpublicity.com/statutes (last visited Feb. 26,
    2016) ....................................................................................................................28

S. 1999-00 Reg. Sess., Senate Third Reading on SB 209 (Burton) as
    amended Mar. 3, 1999 at 10-11 (Cal. 1999).................................................13, 20

Shutterstock, *Terms of Service: Shutterstock License Agreement(s)*,
    http://www.shutterstock.com/license (last visited Feb. 26, 2016) ....................24

*Amici* listed above submit this brief on consent in support of Defendant-Appellee T3Media, Inc.'s ("T3Media") opposition to Plaintiffs-Appellants Patrick Maloney and Tim Judge's ("Appellants") appeal.[1]

## IDENTITY AND INTEREST OF THE *AMICI CURIAE*

The Associated Press ("AP") is a not-for-profit news cooperative whose members are more than 1,300 U.S. newspapers. AP's content – including articles, photographs, and videos – is licensed to its member publishers, as well as to other licensees including news agencies, research databases, government agencies, online news aggregators, clipping services, search engines, and online publishers – many of whom utilize "search capabilities." AP derives significant revenues from membership and license fees, which are critical to support its extensive newsgathering infrastructure worldwide.

The Digital Media Licensing Association ("DMLA") (formerly known as the Picture Archive Council of America, Inc.) is a not-for-profit trade association which represents the interests of entities who license images (still and motion) to editorial and commercial users. Founded in 1951, its membership currently includes over 100 image libraries in North America and internationally that are

---

[1] Pursuant to FRAP 29(c)(5), amici curiae confirm that no counsel for any party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person, other than the amici curiae, its members or its counsel, contributed money that was intended to fund preparing or submitting this brief.

engaged in licensing millions of images, illustrations, film clips, and other content on behalf of thousands of individual creators. Members include large general libraries, such as *amicus* Getty Images (US), Inc. and Shutterstock, Inc., and smaller specialty libraries that provide the media and commercial users with access to in-depth collections of images that represent all aspects of our society and culture, both historical and contemporary. DMLA has developed business standards, promoted ethical business practices, and actively advocated copyright protection on behalf of its members. In addition, DMLA educates and informs its members on issues including technology, tools, and changes in the marketplace.

Getty Images (US), Inc. ("Getty Images") is one of the world's leading creators and distributors of still imagery, footage, and multimedia products, as well as a recognized provider of other forms of premium digital content, including music. Its staff of more than 100 photojournalists covers more than 130,000 events every year across news, sports, and entertainment events globally and it is the official photographer or photographic partner to over 70 of the world's leading sports governing bodies, leagues and clubs, including the PGA, The Olympic Games, Major League Baseball, National Hockey League, NASCAR, and the NBA. In addition to the content it creates and distributes itself, it also distributes the content of more than 200,000 individual contributors and approximately 300 other content providers who also license content such as the Washington Post,

2

Sports Illustrated, Bloomberg, McClatchy Tribune, and others. Getty Images serves business customers in more than 2,100 countries. Its award-winning photographers and imagery help customers produce inspiring work which appears every day in the world's most influential newspapers, magazines, advertising campaigns, films, television programs, books, and websites.

The Graphic Artists Guild (the "Guild") is a professional organization for graphic artists that embraces creators at all levels of skill and expertise, who create art intended for presentation as originals or reproductions. The mission of the Guild is to promote and protect the economic interests of its members, to improve conditions for all creators, and to raise standards for the entire industry. Since its founding in 1967, the Guild has established itself as the leading advocate for the rights of graphic artists on a wide range of economic and legislative issues, from copyright to tax law.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of photojournalism in its creation, editing and distribution. NPPA's approximately 6,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism community. Since its founding in 1946, the NPPA has been the *Voice of Visual Journalists*, vigorously promoting the constitutional rights

of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

PhotoShelter, Inc. ("Photoshelter") builds websites and tools to help over 80,000 photographers and hundreds of businesses archive, distribute, and sell photography online. PhotoShelter's online educational guides have been downloaded over one million times and have helped photographers understand the changing landscape of photography.

The Professional Photographers of America ("PPA") is the world's largest photographic trade association. PPA's membership consists of more than 29,000 direct members and an additional 20,000 affiliated members through the more than 150 independent organizations that have elected to affiliate with PPA. In total, PPA's membership reach includes some 50,000 professional photographers from dozens of specialty areas including portrait, wedding, commercial, advertising, and art. For more than 140 years, PPA has dedicated its efforts to protecting the rights of photographers and to creating an environment in which these members can reach their full business and creative potential.

Shutterstock, Inc. ("Shutterstock") is a leading global provider of high-quality licensed photographs, vectors, illustrations, videos, and music to businesses, marketing agencies, and media organizations around the world. Working with its growing community of over 80,000 contributors, Shutterstock

4

adds hundreds of thousands of images each week, and currently has more than 70 million images and 3 million video clips available.

ZUMA Press, Inc. ("ZUMA Press") is a California-headquartered global wire service. Started in the early 1990s by photojournalists for photojournalists, ZUMA Press is now the world's largest independent press agency and wire service. ZUMA Press produces and represents award-winning news, sports and entertainment from some of the world's greatest photojournalists. The more than 2,100 ZUMA photographers span the globe covering the world's events and issues. ZUMA also represents over 300 picture agencies and over 330 newspapers, as well as numerous top magazine groups.

Together, *amici* possess practical insights on the visual content licensing industry and the new and important market for on-demand art prints. *Amici* respectfully submit this brief in opposition to Appellants' appeal of the District Court's March 6, 2015 decision granting T3Media's Special Motion to Strike under the California anti-SLAPP statute (the "Decision") in order to inform this Court of the serious and damaging effects that a reversal of the District Court's Decision will have on the visual content licensing industry, the media, and the photographers who provide those industries with content. The Decision provides clear and logical guidance in a historically misunderstood and misconstrued area of law that will allow visual content providers, large and small, and photographers

5

and illustrators to continue to offer their collections to the world; thus, *amici* have an immediate interest in this appeal.

Reversal of the Decision and reinstatement of Appellants' right of publicity claims would send a message to copyright owners and licensors that they act at their peril simply by offering creative, newsworthy, and culturally important images to the publishing, news broadcasting, documentary filmmaking, and educational industries, as well as the public in general. It is squarely against long-standing industry practice to determine that an image licensor must obtain the subject's prior approval before a copyrighted image can be offered to prospective licensees. Each time the media accesses and acquires visual content for publication from a photographer, illustrator, or image distributor, a copyright licensing transaction occurs. If the mere display for offer and issuance of a copyright license is determined to be a commercial use subject to restrictions under state publicity law, photographers, illustrators, and their image distributors would risk liability based on necessary business practices and the media and the public would be deprived of visual content depicting recognizable people that both inform them and enrich their lives.

For the reasons explained below, image creators and image licensors should not be subject to liability for merely exercising their rights under the Copyright Act

and the First Amendment to offer their visual works on websites for legitimate licensing or to make them available to purchase as art prints.

## ARGUMENT

T3Media's brief explains why, as a matter of law, Appellants' right of publicity claims are preempted by the Copyright Act. Rather than repeat those arguments, *amici* will explain (1) the important role visual content licensors and the increasingly popular art print services play in providing expressive and newsworthy images to the public; (2) the critical distinction between a photograph as an independent creative work and other products or advertisements that may bear likenesses of recognizable people; and (3) as a practical matter, why reversing the Decision would impair legitimate uses of copyrighted images in a way that is contrary to long-standing industry practice, would impede the burgeoning art print market, and would expose visual content licensors and creators to liability for merely attempting to exert their rights under the Copyright Act and the First Amendment.

## I. THE VISUAL CONTENT INDUSTRY SERVES AN IMPORTANT PURPOSE FOR PUBLISHERS, THE MEDIA, AND THE PUBLIC AT LARGE

Most published images and other audiovisual materials available in our media-rich environment are licensed for use from online image distributors and aggregators, news wire services, or individual visual artists' and photographers'

libraries. Some content is still created on assignment or by staff, but searching for and licensing existing visual content from online image aggregators has largely become the norm as more and more media publishers reduce staff photographer ranks. Image licensors (who also sometimes offer audiovisual and musical content) run the gamut from large collections with millions of images covering myriad subjects, such as the libraries maintained by *amici* Getty Images, Shutterstock, and AP, to niche libraries specializing in nature, science, history, or entertainment, and news wire services such as *amicus* Zuma Press and Shutterstock subsidiary Rex Features which solely license editorial content (*e.g.*, news and sports[2]). In addition, many publications maintain their own collections and offer the public, either through direct licensing or through other aggregators, the opportunity to acquire images as art prints in addition to selling subscriptions.

On-demand art print services have become increasingly popular recently as the public recognizes photographs and illustrations for their artistic as well as informational. Through image aggregators, newspapers, and other websites dedicated to distributing art prints, photographers and other visual artists (or their representatives, such as *amici* Shutterstock and Getty Images) can upload visual content directly to customer-facing platforms which in turn license content to art

---

[2] Getty Images has over 100 staff photojournalists and also represents the Sports Illustrated photo archive, among others. Likewise, AP has an award-winning staff of photojournalists and is the official photographic agency of the NFL.

photographic platforms that permit anyone to purchase an art print of unlimited subject matter with just a few clicks, and enjoy the beauty of a photograph or illustration to enhance their personal environment. Art prints differ from posters because art prints are printed individually (often in limited editions) in high resolution with true color reproduction on high-quality paper whereas posters are mass-produced in lower image quality and on lesser-quality paper.[3] What was once limited to those who could afford to purchase art in a gallery is now available to the general public.

*Amici* also provide many of the images (and much of the audiovisual content) relied upon by publishers, broadcasters, and media companies to illustrate newsworthy events and stories of public interest. Without the service of image licensors offering licensing services on behalf of visual content creators, the media would be restricted to those images from events captured by staff photographers and videographers, which would be extremely limiting or indeed non-existent as more and more media outlets downsize and eliminate their photojournalist positions.[4] Instead, the media – or anyone needing visual content – can search

---

[3] *See Product Information Glossary*, Art.com,
http://www.art.com/asp/customerservice/glossary-asp/_/posters.htm#q2 (last visited Feb. 26, 2016).

[4] *See, e.g.*, Robert Channick, *Chicago Sun-Times Lays Off All Photographers,* Chi. Trib. (May 31, 2013), http://articles.chicagotribune.com/2013-05-31/business/ct-biz-0531-sun-times-photographer-layoffs-20130531_1_sun-times-media-group-chicago-sun-times-timothy-knight; Erik Wemple, *Washington Times Lays Off*

through online databases to find the content that best suits their needs. Current shifts in the media and newspaper industries have resulted in ever-increasing reliance upon these online aggregators for content that can no longer be offered by staffers.

Offering images for license to potential users is nothing new. Image libraries have offered images to potential licensees for over 70 years. Before the Internet age, image libraries aggregated physical transparencies and prints by subject matter in file cabinets. In-house or freelance researchers would search the files in response to requests by publishers and other users, and then deliver samples of relevant images for possible licensing. After publication, these images would be returned and filed for future use. The Internet offers efficiencies in aggregating, searching, displaying, and delivering image samples to prospective licensees, but it was the efforts of image licensors that created searchable digital databases making nearly instant access to licensable imagery possible. As a result publishers and others can easily search, access, and license images and acquire prints of the best content documenting news, arts, science, sports, political, and cultural events throughout the world at a moment's notice on a 24/7 basis.

---

*Staff*, Wash. Post, Jan. 4, 2013, https://www.washingtonpost.com/blogs/erik-wemple/wp/2013/01/04/washington-times-lays-off-staff/; Kim Peterson, *Why Sports Illustrated Laid Off All of Its Photographers*, CBS NEWS, http://www.cbsnews.com/news/why-sports-illustrated-cut-all-of-its-photographers/.

No one ever challenged the industry's use of hard copy files to make images available to potential users for licensing purposes. That is because visual content creators and providers, by merely displaying and offering for license imagery depicting people, do not make any use that implicates the right of publicity. That visual content creators and providers now must host images on the Internet in digital form to offer them to potential licensees as a necessity of the modern business environment should not change the result.

## II. INDEPENDENT EXPRESSIVE VISUAL WORKS DO NOT VIOLATE THE RIGHT OF PUBLICITY AND CAN EXIST IN THE MARKETPLACE CONSISTENT WITH WELL-ESTABLISHED COPYRIGHT AND FIRST AMENDMENT PRINCIPLES

Permitting Appellants to proceed on their right of publicity claims would severely undermine the copyright and First Amendment rights afforded to visual content creators, licensors, and print services.

### A. Licensing a Visual Work or Offering It as an Art Print Is Distinct from Using the Visual Work in Connection with Merchandise or Advertising.

There is a clear distinction between offering for license and licensing a visual work such as a photograph or illustration (or offering for sale and selling an art print) for the enjoyment of an expressive work of art, and using that photograph or illustration to sell merchandise or advertise an unrelated product or service. This distinction is integral to the balance between copyright and First Amendment protection and the right of publicity, yet it is often overlooked or misconstrued by

11

courts and litigants alike; Appellants and their *amici* are no exception. The District Court, however, correctly recognized this difference, *see Maloney v. T3Media, Inc.*, 94 F. Supp. 3d 1128, 1138, 1139 (C.D. Cal. 2015), as this Court should.

For example, the license of a photograph or the purchase of an art print depicting a person is related to the use of a photograph *as a photograph*. Neither one implicates the right of publicity as would the use of an image on merchandise or in an advertisement – as contemplated by California Civil Code § 3344, which prohibits the use of one's image or likeness "on or in products, merchandise, goods or services, without such person's prior consent" – because the photograph *as a photograph* is not merchandise, but rather is an independent and copyrightable work of creative expression. *See, e.g.*, *White v. City of Sparks*, 500 F.3d 953, 955-57 (9th Cir. 2007) (recognizing that "visual art is inherently expressive"); 2 J. Thomas McCarthy, THE RIGHTS OF PUBLICITY AND PRIVACY, § 8.72 (2d ed. 2006) (hereinafter "McCarthy") ("An artistic rendering of a recognizable person may be protected as expressive art from liability as an infringement of the right of publicity."); *id.* at § 11.52 ("Almost any photograph of a real person will contain some minimal elements of creativity and originality."). The same is true for any work of visual art.

The photographs at issue here are expressive copyrightable works, not accompaniments to merchandise or advertisements, so the Copyright Act preempts

Appellants' publicity rights. *See* 1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 1.01[B][3][b][iv][II] (2014 ed.) (hereinafter "Nimmer") (right of publicity claims preempted when use of a work is expressive); S. 1999-00 Reg. Sess., Senate Third Reading on SB 209 (Burton) as amended 3/3/99 at 10-11 (Cal. 1999) ("Cal. Civ. Code Section . . . also must be read to immunize expressive works from right of publicity claims[.]") (citation omitted). As the District Court explained, the right of publicity is not implicated by an art print business because the use of the subject's likeness is "wholly contained" within the four corners of the photograph, *Maloney*, 94 F. Supp. 3d at 1139, and Appellants "d[id] not allege how [T3Media] uses the photographs to advertise anything other than the sale of the pictures." *Id.* at 1138. Therefore Appellants' attempt "to prevent nothing more than the reproduction . . . distribution, or display of a [copyrighted work] is subsumed by copyright law and preempted." *Id.* (internal citations omitted). *See also Timed Out, LLC v. Youabian, Inc.*, 229 Cal. App. 4th 1001, 1013 (Cal. Ct. App. 2014) ("Defendants' use of the Models' likenesses pictured in the photographs to promote Defendants' business constitute[d] the alleged misappropriation," not publishing of photographs); *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1116 (C.D. Cal. 2011) (distinguishing use of one's likeness "to advertise . . . the copyright license to the image itself" from advertising "an unrelated product").

13

To equate photographs as expressive works with merchandise like trading cards, board games, posters, bobbleheads, and mousepads, as do Appellants (*see* App. Br. at 22, 29, 30, 32), and Appellants' *amici* (*see* Amicus Brief of Players' Associations ("PA Br.") at 6, 7, 9, 18), is a false equivalence. Appellants and their *amici* conflate very different uses of photographs presumably to muddy the waters and continue to foster and exploit the common confusion between visual works as *expressive* works entitled to full First Amendment protection and merchandise within which a visual work is incorporated. However, as this Court explained, "the right of publicity is not a license to limit the copyright holder's rights merely because one disagrees with decisions to license the copyright." *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1145 (9th Cir. 2006).

*Downing v. Abercrombie & Fitch*, upon which Appellants heavily rely, is actually an apt illustration of the distinction between photographs as art and as advertisement. As this Court observed in *Laws*, the defendant in *Downing* "had not merely published the photograph. Rather, it published the photo in connection with a broad surf-themed advertising campaign . . . [that] offered for sale the same t-shirts worn by the plaintiffs in the photo." 448 F.3d at 1141 (citing *Downing*, 265 F.3d 994 (9th Cir. 2001)). Accordingly, the use of the plaintiffs' likeness was not expressive or newsworthy and therefore violated the right of publicity. *See Downing*, 265 F.3d at 1002-03. *Downing's* holding was specific to the use of the

photograph in the context of an advertisement for a product other than the photograph, and does not stand for the broad proposition that the law prohibits all licensing or art print sales involving images depicting identifiable people, even those who have not consented.

Moreover, the fact that a photograph is licensed or sold as a print in a commercial context does not change the result. Every lawful use of an image (including an image depicting a recognizable person) involves some underlying licensing or sales transaction; this is the simple reality of how image licensing works. The mere exchange of money, however, does not convert copyright- and First Amendment-protected uses of images into publicity-violating purchases of merchandise. *See Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) ("[E]conomic motive in itself is insufficient to characterize a publication as commercial"). *Cf.* McCarthy, § 8.67; *Aldrin v. Topps Co.*, No. 2:10-cv-09939, 2011 WL 4500013, at *2 (C.D. Cal. Sept. 27, 2011) ("An expressive activity does not lose its constitutional protection because it is undertaken for profit.") (internal citations and quotation marks omitted); *Foster v. Svenson*, 128 A.D.3d 150, 160, (N.Y. App. Div. 2015) (photographs were First Amendment-protected artworks; "any advertising undertaken in connection with the promotion of the art work" did not violate publicity statute).

Courts have long accorded First Amendment protection to material published in books, newspapers, and magazines, even though these media earn profits from transactions involving the depiction of personal identity. *See, e.g.*, *Joseph Burstyn v. Wilson, Inc.*, 343 U.S. 495, 501-02 (1952); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 797 n.2 (Cal. Ct. App. 1995) ("The First Amendment is not limited to those who publish without charge."). Similarly, the policy behind the Copyright Act is accomplished largely by ensuring that creators are compensated for their valuable contributions to culture and society. *See Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor . . . to stimulate artistic creativity for the general public good."). Presumably for these reasons, California's right of publicity statute focuses not on whether the transaction earns a profit, but on the nature of the end use which, as discussed herein, is the appropriate inquiry. *See generally* Cal. Civ. Code § 3344 (2016).

Indeed, these principles are increasingly important as expressive and newsworthy photographs have converged, giving rise to a unique market for photographs depicting historical events that now are considered collectable art. For instance, news photographer Usher Fellig (known as "Weegee") was famous for crime scene photographs – many depicting identifiable people – which became

16

"successful in the popular media and respected by the fine-art community" due to "the strong emotional connection forged between the viewer and the characters in his photographs."[5] Similarly, the iconic works of sports photographers like Walter Iooss and Neil Leifer depicting famous athletes are considered highly valued fine art collectibles,[6] and major newspapers like the *New York Times* offer on-demand art prints of newsworthy photographs to customers, an entire sub-category of which depicts historical and otherwise famous people.[7]

It is crucial for the image licensing, art print, photography, and visual art industries that copyright owners' ability to offer and license images is not mistakenly considered an impermissible "commercial appropriation" as the Appellants' *amici* would have this Court believe. (*See* PA Br. at 19.) This notion is important now, more than ever, given the ubiquity of online visual content licensing, the popularity of art print services, and the millions of images that are available at the click of a mouse.

---

[5] Artist Weegee, Int'l Ctr of Photography, http://www.icp.org/browse/archive/constituents/weegee?all/all/all/all/1 (last visited Feb. 26, 2016).

[6] *See, e.g.*, Fred Bowen, *With Walter Loos, Sports Became Art*, WASH. POST (Nov. 25, 2009), http://www.washingtonpost.com/wp-dyn/content/article/2009/11/24/AR2009112403823.html; Muhammad Ali Vs. Liston II, MORRISON HOTEL GALLERY, https://www.morrisonhotelgallery.com/set/default.aspx?setID=1350 (last visited Feb. 25, 2016); Neil Leifer, ARTNET, http://www.artnet.com/artists/neil-leifer/ (last visited Feb. 25, 2016).

[7] *See People*, N.Y. TIMES, https://www.nytimes.com/store/photos/people.html (last visited Feb. 26, 2016).

### B. Appellants' Interpretation of the Right of Publicity Is Inconsistent with Copyright Law and the First Amendment.

Appellants and their *amici* ask this Court to interpret California's right of publicity laws in a manner that would directly interfere with the exclusive rights afforded to photographers and other visual artists and copyright owners and their representatives (such as visual content licensors and art print services) under the Copyright Act and the broad protections applicable to expressive and newsworthy works under the First Amendment. This Court should follow the lead of the District Court and decline Appellants' invitation.

Under federal law, copyright holders, or their authorized representatives, have *exclusive* statutory rights to exploit their copyrighted works. *See* 17 U.S.C. § 106 (2016). To hold for Appellants, as the District Court explained, would "destroy [] the *exclusivity* of rights the Copyright Act aims to protect" because such a holding would "effectively giv[e] the subject of every photograph veto power over the artist's rights." *Maloney*, 94 F. Supp. 3d at 1138. Courts have come to similar conclusions in the context of different media, such as motion pictures. *See, e.g.*, *Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911 (Cal. Ct. App. 1996) (performers in copyrighted film may not use right of publicity to prevent exclusive copyright holder from distributing film; such claims are preempted); *Dryer v. Nat'l Football League*, No. 14-3428 (8th Cir. Feb. 26, 2016) (former NFL players'

18

publicity claims preempted; players could not "attempt to control dissemination" of films depicting players' participation in historical games).

Significantly, ruling in favor of Appellants' right of publicity claims would impermissibly constrain relevant stakeholders' First Amendment rights and would undoubtedly inhibit expressive and creative uses of visual content that depicts people. For example, *amicus* Getty Images displays and licenses news, sport, and entertainment content to every major news outlet globally, many of whom only license the content displayed on their websites, newspapers, and print media via Getty Images' websites, to the tune of more than 100 million downloads per month. Its customers include the *New York Times*, the *Washington Post*, the *LA Times*, the *Chicago Tribune*, NBC, MSNBC, CBS, ABC, CNN, Fox News, the *Financial Times*, and the BBC. If Appellants' interpretation of the right of publicity stands, the chilling effect on the dissemination of news and information to the public will be profound.

Appellants' myopic interpretation of the First Amendment protection of visual content is based on an expansive reading of a dubious precedent – *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (Cal. 2001). (*See* App. Br. at 10, 52-53.) Appellants equate T3Media's use of college sports photographs with drawings of the Three Stooges, which were found to not be "transformative" enough to escape liability under California's right of publicity statute. However,

19

under the logic of Appellants' expansive reading of *Saderup*, every photograph accurately depicting a recognizable person (without the subject's consent) would infringe that person's right of publicity, effectively forcing courts to favor the subject's publicity interest over the artist's interest in freedom of expression. *Saderup*'s "transformative" test did not – and should not – apply to the taking of photographs, which is an expressive act that falls outside the ambit of the right of publicity. *See* S. 1999-00 Reg. Sess., Senate Third Reading on SB 209 (Burton) as amended 3/3/99 at 10-11 (Cal. 1999); McCarthy § 8.72; Nimmer § 1.01[B][3][iv][II].

Even applying *Saderup*, photographs, themselves, should be deemed inherently transformative. Photographs – including sports action shots and posed photos like those at issue here (*see* T3Media Mot. to Strike, Dist. Ct. Dkt. No. 36 Exhs. E-I) – include significant "transformative elements." *Saderup*, 25 Cal. 4th at 407. *See* McCarthy, § 8.72 ("Even a routine amateur photograph of a person has some 'transformative' elements."). For over 130 years courts have held that photographs, including portraits of people, are creative and original enough beyond merely rendering a three-dimensional object into two dimensions to be copyrightable. *See, e.g.*, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884) (photographs copyrightable "so far as they are representatives of original intellectual conceptions of the author"); *Bleistein v. Donaldson Lithographing Co.*,

188 U.S. 239, 250 (1903) (chromolithographs depicting real scenes and people copyrightable because they reflected "the personal reaction of an individual upon nature").

Photographers use their tools and artistic judgment by manipulating lighting, angle, positioning, and timing such that the photograph is "primarily the [photographer's] own expression" and the subject is merely part of the overall artwork, as opposed to "the very sum and substance of the work." *Saderup*, 25 Cal. 4th at 406. *See also Los Angeles News Serv. v. Tullo*, 973 F.2d 791, 793-94 (9th Cir. 1992) (noting that "the courts . . . 'have carefully delineated selection of subject, posture, background, lighting, and perhaps even perspective alone as protectible elements of a photographer's work'") (internal citation omitted); Nimmer, § 2.08[E][1], at 2-126.3. Here, the marketability of the photographs did not derive primarily from the student athletes' fame, but rather from the historic nature of the events and the photographers' expressive choices in capturing the shots.[8] *Cf. Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012)

---

[8] Assuming it even applies, there simply is no legal basis under *Saderup* for carving out an entire expressive medium from First Amendment protection based on a state statute. S*ee, e.g.*, *Winter v. DC Comics*, 30 Cal. 4th 881, 891 (Cal. 2003) ("It does not matter what precise literary category the work falls into. What matters is whether the work is transformative . . . ."). Nor is there any basis for effectively outlawing the image licensing and art print industries' business model of offering such works through display online. *Cf. id.* ("If the challenged work is transformative, the way it is advertised cannot somehow make it nontransformative.").

("Simply because a photo documents an event does not turn" that photo "into a factual recitation. . . ."). As this Court just recently held, the First Amendment "safeguards the storytellers and artists who take the raw materials of life – including the stories of real individuals, ordinary or extraordinary – and transform them into art, be it articles, books, movies, or plays." *Sarver v. Chartier*, -- F.3d --, No. 11-56986, 2016 WL 625362, at *10 (9th Cir. Feb. 17, 2016) (affirming dismissal on anti-SLAPP grounds of plaintiff's right of publicity claim). There is no reason that this Court should not include photographs and other visual content in the above list.

Reversing the Decision would also undermine licensors', photographers', and media entities' ability to utilize photographs depicting people for editorial use in connection with events that are newsworthy or otherwise of public interest. Neither custom nor case law has ever conditioned this federal right on a copyright holder obtaining permission from a subject depicted, based on how a future licensee might use a photograph. The practical business reality in this digital age is that the media obtains images through online aggregators and must be permitted to continue doing so in order to swiftly inform the public of important issues and stories that necessitate visual content. Under First Amendment principles, rights of publicity never have extended to "editorial" uses in publishing, news broadcasting, documentary filmmaking, or educational materials; for these uses, media company

licensees need not seek the subject's consent or pay the subject depicted in a photograph. *See* McCarthy at § 8.46, *et seq*. (discussing "media uses of human identity"). Reversing the District Court would turn this long-standing body of law on its head.

The day-to-day implications are evident just by looking at a newspaper. For example, the *New York Times* published a series of articles to commemorate Black History Month centered on unpublished photographs taken from the newspaper's archives of notable figures such as Arthur Ashe and Jackie Robinson.[9] The *New York Times* can, and should be able to, use or license such photographs without obtaining permission from the subjects (or their estates). Likewise, *amicus* AP, from whom the *New York Times* obtained some of these photographs, should be able to display and license them for such use. Otherwise, important stories like these that reflect upon important historical and cultural moments in American culture would be discouraged.

Consistent with the District Court's Decision, the proper focus of the right of publicity inquiry – one that honors the copyright and First-Amendment rights discussed above – is on the end-users of the images. The end-user is typically bound by an end-user license agreement ("EULA") governing the permissible uses

---

[9] *See, e.g.*, Rachel L. Swarns ET AL., *Unpublished Black History*, N.Y. TIMES (Jan. 17, 2016), http://www.nytimes.com/interactive/projects/cp/national/unpublished-black-history/roy-campanella-at-ebbets-field-1960.

23

of images depicting identifiable people, some of which would require consent, such as use in an advertisement or a use that could be considered offensive. The EULA places the burden of procuring additional permissions squarely on the end-user.[10] Indeed, all of the *amici* that are in the business of licensing content for commercial purposes require their licensees to obtain all necessary consents for the use of unreleased imagery.[11] If the end-user uses the image in a restricted manner without the requisite permissions, the subject of the photograph would have recourse against the end-user – not the copyright owner or licensor – pursuant to the right of publicity.

---

[10] *See, e.g.*, *License Agreements*, GETTY IMAGES, http://www.gettyimages.com/Corporate/LicenseAgreements.aspx (last visited Feb. 26, 2016).

[11] *See id.* ("2.3 Unless additional rights are stipulated in the Rights and Restrictions or granted pursuant to a separate license agreement, Editorial Licensed Material may not be used for any commercial, promotional, endorsement, advertising or merchandising use.") ("4.2 . . . Licensee shall be solely responsible for determining whether release[s] is/are required in connection with any proposed use of Licensed Material, and Licensee shall be solely responsible for obtaining all necessary release[s]."); Shutterstock, *Terms of Service: Shutterstock License Agreement(s)*, http://www.shutterstock.com/license (last visited Feb. 26, 2016) (I.c.iv.: "You may not . . . Use Visual Content designated 'Editorial Use Only' for commercial purposes" and "If you require any of the foregoing rights, please contact Customer Service") (IV.j.: "Shutterstock only has model or property releases where expressly indicated" on its website).

**III.  REVERSING THE DISTRICT COURT WOULD HAVE SIGNIFICANT CHILLING EFFECTS ON THE VISUAL CONTENT INDUSTRIES AS WELL AS THOSE THAT RELY ON LICENSED VISUAL CONTENT DEPICTING RECOGNIZABLE PEOPLE, SUCH AS THE MEDIA**

A right of publicity like the one Appellants imagine would be devastating for creators and licensors of visual content and sellers of art prints, particularly given the ubiquity of online image licensing and the popularity of on-demand art prints.  Appellants' right of publicity regime would impose on these businesses logistically impossible and financially crippling standards to engage in what is – and has been for decades – business as usual, and would chill the media's right and ability to report on newsworthy events and other issues of public interest.

**A.  Permitting Right of Publicity Actions as Envisioned by Appellants Will Disproportionately Impact Visual Content Creators and Licensors, Art Print Services, and Those They Serve.**

Appellants would have visual content creators and licensors and art print services obtain – and pay for – written consent from each and every recognizable individual depicted in visual art prior to displaying, licensing, or selling such works.  (*See* App. Br. at 7-8).  This Sisyphean effort would be impossible for even the largest visual content licensors (such as *amici* AP, Getty Images, and Shutterstock) let alone small image libraries, startup art print services, and individual photographers, who will be hit the hardest.  News media outlets, whether print, web or broadcast, would be stifled as their largest source of imagery

25

dries up and their already diminished staff would be stretched further. Leaving aside the costs of such efforts, the time to obtain such permission, or the lack of its grant, would be chilling. For example, the *Washington Post* used an image of the Kalamazoo mass murder suspect in the aftermath of the February 20, 2016 shooting. The photo was credited to the Kalamazoo County Sheriff's Office/via Reuters. Even assuming the *Washington Post*, Reuters, or the Sheriff's office had the staff to seek the suspect's permission, it cannot possibly be the case that the choice of publishing that image lies solely in the hands of the person depicted.[12]

Unable to pay permission fees to every individual depicted in an image, small businesses and sole proprietors would be forced to limit, or even forbid, access to images depicting identifiable people and effectively eliminate a significant sector of their business – one that is extremely important to the news media, art collectors, and public alike. And the costs of defending right of publicity lawsuits would all but bankrupt most, and will ultimately deprive many others (including the news media) of readily available content that is crucial to their own businesses. Appellants essentially seek to outlaw an entire aspect of well-established and lawful businesses; as a matter of law and policy, this Court

---

[12] *See* Mark Guarino, Wesley Lowery and Mark Berman, *Kalamazoo Police: Uber Driver's Alleged Rampage is 'baffling'*, WASH. POST (Feb. 22, 2016), https://www.washingtonpost.com/news/post-nation/wp/2016/02/22/kalamazoo-shooting-rampage-suspect-set-to-appear-in-court-today/.

should condone such a result, particularly because the equities weigh squarely in favor of T3Media and those similarly situated.

The practical ramifications are exponentially worse for these businesses than for athletes and celebrities. Visual and audiovisual content constitutes the entire market (or a substantial majority of the market) for visual content creators and licensors and art print services, and a significant portion of that market consists of content depicting recognizable individuals. A ruling in favor of Appellants would destroy that market. In contrast, as Appellants and their *amici* tout, there is a multi-billion dollar right-of-publicity industry spread across innumerable goods and services, of which visual images *as visual images* are a fraction. (*See, e.g.*, PA Br. at 7, 9, 19.) Affirming the District Court would not inhibit the rights of athletes and celebrities to exploit their own fame; it would strike the correct balance by allowing them to control their images as used in merchandise or advertising while simultaneously permitting visual content creators and licensors, art print services, and the media to use images for expressive and newsworthy purposes.

Moreover, athletes, celebrities, and individuals whose images and likenesses are used for unauthorized commercial purposes are not without remedies. As noted above, those remedies are properly asserted against the end-user of the content, not the party from whom the content is procured. Reversal of the Decision would impose primary liability upon visual content creators and licensors

simply because an end-user might breach its EULA by failing to obtain permission for a certain use. Placing responsibility and liability for obtaining the proper consent for all planned uses solely upon end-users satisfies the privacy and economic concerns underlying the right of publicity without placing an impossible burden on visual content creators, licensors, art print services, and the media.

**B.      Reversal of the District Court Will Affect How Visual Content Is Offered Nationwide from Both Licensors' and Licensees' Perspectives.**

Twenty-two states have passed right of publicity statutes, and thirty-eight recognize a common law right of publicity. *See* McCarthy at § 6:3.[13] While all states that recognize a right of publicity address the use of an individual's likeness for a commercial purpose without permission, *see generally id.* at §§ 6:3 & 6:4, *amici* are aware of no holding by a court that the mere offering of visual content for copyright licensing or printing – or display in pursuit of a license or purchase of an art print – violates a right of publicity.

As a practical matter, it is simply impossible to license visual content or sell art prints without a right to first offer them through visual display because a textual description is no substitute for a visual image. For example, merely describing Joe Rosenthal's 1945 photograph of soldiers raising the flag on Iwo Jima as "U.S. soldiers raising a flag" fails to capture the emotion and patriotic sentiment that

---

[13] *See also Statutes & Interactive Map*, RIGHT OF PUBLICITY, http://www.rightofpublicity.com/statutes (last visited Feb. 26, 2016).

looking at the photograph provides. Licensees cannot possibly rely upon textual descriptions of images or film footage because they need to see whether the image or footage is appropriate for their needs.

Moreover, a holding in California that the display of visual content for potential licensing or printing violates the publicity rights of individuals depicted in such content would cripple the ability to license or print anywhere in the United States because it would significantly frustrate the visual content industry's efforts to offer its content on the Internet. Given that visual content licensing is primarily conducted online on a nationwide basis, the questionable status of an image in California would discourage the display of that image nationwide.

It is no answer to say that the image licensing industry could revert to pre-Internet industry practices, for that would ignore the current digital environment and would lead to absurd results. Customers – including publishers, newspapers, news broadcasters, film and television producers, art collectors, and others – expect to be able to search and select images from anywhere at any time, and they require that instant access oftentimes to meet tight publishing deadlines. Nothing about the display of the likenesses of individuals on a website, among the many thousands or millions of images available in any image library's database of images for example, justifies requiring the consent of the subjects of the images before a display can be made.

29

Under Appellants' reading of the law, however, merely offering clients the ability to review content to determine whether such content is suitable for their purposes amounts to a violation of a person's right of publicity.  If visual content creators and licensors and art print services have to remove all images depicting people from their databases, all the time and money invested in archiving, scanning, and uploading content and in creating their websites and databases will be wasted.  Moreover, all identifiable persons will be able to thwart and censor the use of their images, even for the myriad of lawful purposes described above that do not require consent, simply by claiming that visual content providers are violating their right of publicity by displaying their images for customer consideration. That result is absurd and is plainly contrary to the California Supreme Court's goal in balancing a public figure's right of publicity against the First Amendment.  *See Saderup*, 25 Cal. 4th at 403.

Finally, the loss of visual content being available for licensing and printing would be a blow to the preservation of our national and historical heritage.  If the Decision were reversed, the legal status of large portions of image libraries depicting America's cultural heritage would be thrown into a legal grey area merely because some images depict identifiable individuals.  Images help tell our history and educate our children.  If the Decision is reversed, the country would lose images that inspire or incense us; images of sports teams' legendary victories;

30

images of ticker tape parades and red carpet dresses; images of war and peace – all because these images depict people.

## <u>CONCLUSION</u>

For the reasons stated herein, *amici* respectfully request that this Court affirm the District Court's Decision granting T3Media's special motion to strike on Copyright preemption grounds.

Dated:     New York, New York
           February 26, 2016

COWAN, DEBAETS, ABRAHAMS
& SHEPPARD LLP

By:   <u>s/ Nancy E. Wolff</u>
      Nancy E. Wolff
      41 Madison Avenue, 34th Floor
      New York, NY 10010
      212-974-7474


Attorneys for *Amici Curiae*

On the Brief:
Scott J. Sholder
Marissa B. Lewis
Cowan, DeBaets, Abrahams & Sheppard LLP

## <u>CERTIFICATE OF COMPLIANCE</u>

## U.S. COURT OF APPEALS CASE NO. 15-55630

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and 32(a)(7)(B) because this brief contains 6,996 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted by Microsoft® Word 2010.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010, Times New Roman, 14 point font.

Dated:      New York, New York
             February 26, 2016

                    COWAN, DEBAETS, ABRAHAMS
                      & SHEPPARD LLP

                    By:   <u>s/ Nancy E. Wolff</u>
                         Nancy E. Wolff
                         41 Madison Avenue, 34th Floor
                         New York, NY 10010
                         212-974-7474

                         Attorneys for *Amici Curiae*

On the Brief:
Scott J. Sholder
Marissa B. Lewis
Cowan, DeBaets, Abrahams & Sheppard LLP

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 26, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


s/ Simone Cintron
Appellate Paralegal
COUNSEL PRESS, INC.