No. 15-55630

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

PATRICK MALONEY and TIM JUDGE,

*Plaintiffs-Appellants*,

*v.*

T3MEDIA, INC.,

*Defendant-Appellee.*

_____

United States District Court, Central District of California
Honorable Andre J. Birotte, Jr.
D.C. 2:14-cv-05048-AB-VKB

_____

**BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND 22 MEDIA ORGANIZATIONS IN
SUPPORT OF DEFENDANT-APPELLEE**

_____

Bruce D. Brown (bbrown@rcfp.org)
 *Counsel of Record*
Gregg P. Leslie (gleslie@rcfp.org)
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, DC 20005
Telephone:  (202) 795-9300
Facsimile:  (202) 795-9310

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ........................................................... ii

RULE 29(C)(5) CERTIFICATION .................................................. 1

CORPORATE DISCLOSURE STATEMENTS .................................... 1

SOURCE OF AUTHORITY TO FILE BRIEF ................................... 5

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................. 6

INTRODUCTION ........................................................................ 8

SUMMARY OF ARGUMENT ....................................................... 10

ARGUMENT .............................................................................. 10

I.      The photographs should receive full First Amendment
protection, with any restrictions subject to strict scrutiny.................. 12

        A.    The photographs contained in the NCAA photo
library should be classified as First Amendment-
protected noncommercial speech. ........................................... 14

        B.    Right of publicity laws are content-based
restrictions on speech subject to strict scrutiny, a
standard the Plaintiffs cannot overcome. ................................. 16

II.     The right of publicity is a narrow exception to the First
Amendment, not *vice versa*. ............................................... 21

CONCLUSION........................................................................... 24

STATEMENT OF RELATED CASES ............................................. 25

APPENDIX A: STATEMENTS OF INTEREST .................................. 26

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP.
P. 32(a)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE
NUMBER 15-55630 ................................................................. 30

CERTIFICATE OF SERVICE ........................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ann-Margret v. High Society Magazine, Inc.*,
  498 F. Supp. 401 (S.D.N.Y. 1980) ............................................................. 22

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ....................................................................................... 12

*Bery v. City of New York*,
  97 F.3d 689 (2d Cir. 1996) ............................................................................ 14

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983) .......................................................................................... 14

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
  447 U.S. 557 (1980) ................................................................................. 13, 23

*City of San Diego v. Roe*,
  543 U.S. 77 (2004) .......................................................................................... 18

*Connick v. Myers*,
  461 U.S. 138 (1983) ........................................................................................ 18

*Current Audio, Inc. v. RCA Corp.*,
  337 N.Y.S.2d 949 (NY App. 1972) ............................................................... 22

*Dryer v. Nat'l Football League*,
  No. 14-3428 (8th Cir. Feb. 26, 2016) ......................................................... 16

*ETW Corp. v. Jireh Publ'g, Inc.*,
  332 F.3d 915 (6th Cir. 2003) ....................................................................... 14

*Frazier v. Boomsma*,
  No. 07-8040-PHX-NVW, 2007 U.S. Dist. LEXIS 72427 (D.
  Ariz. Sept. 27, 2007) ................................................................................ 17, 18

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) .......................................................................................... 21

# TABLE OF AUTHORITIES *(continued)*

**Page(s)**

*Gionfriddo v. Major League Baseball*,
94 Cal. App. 4th 400 (2001) ......................................................... 19

*Grosjean v. American Press Co.*,
297 U.S. 233 (1936)...................................................................... 11

*Harper & Row, Publrs. v. Nation Enters.*,
471 U.S. 539 (1985)...................................................................... 23

*Hilton v. Hallmark Cards*,
599 F.3d 894 (9th Cir. 2010) ....................................................... 21

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,
Inc.*, 515 U.S. 557 (1995)............................................................. 14

*Joseph Burstyn v. Wilson*,
343 U.S. 495 (1952)...................................................................... 15

*Maloney v. T3Media, Inc.*,
94 F. Supp. 3d 1128 (C.D. Cal. 2015) ...................................... 8, 9

*Midler v. Ford Motor Co.*,
849 F. 2d 460 (9th Cir. 1988) ...................................................... 22

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983)...................................................................... 11

*Montana v. San Jose Mercury News*,
34 Cal. App. 4th 790 (1995). ....................................................... 19

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)...................................................................... 21

*Paulsen v. Personality Posters, Inc.*,
299 N.Y.S.2d 501 (NY App. 1968) .............................................. 22

*R.A.V. v. St. Paul*,
505 U. S. 377 (1992)..................................................................... 12

**TABLE OF AUTHORITIES** *(continued)*

<u>**Page(s)**</u>

*Reed v. Town of Gilbert,*
135 S. Ct. 2218 (2015) ................................................................ 12, 13, 16

*Rosemont Enter., Inc. v. Random House, Inc.,*
294 N.Y.S.2d 122 (NY App. 1968) ............................................ 22

*Sarver v. Chartier,*
No. 11-56986, 2016 U.S. App. LEXIS 2664 (9th Cir. Feb. 17,
2016) .......................................................................... 17, 18, 21, 23

*Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,*
502 U.S. 105 (1991) .................................................................... 12

*Turner Broad. Sys. v. FCC,*
512 U.S. 622 (1994) .................................................................... 13

*United States v. Alvarez,*
132 S. Ct. 2537 (2012) ................................................................ 13

*Valentine v. CBS, Inc.,*
698 F.2d 430 (11th Cir. 1983) .................................................... 22

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer
Council,* 425 U.S. 748 (1976). .................................................... 14, 15

*Waits v. Frito-Lay, Inc.,*
978 F.2d 1093 (9th Cir. 1992) .................................................... 22

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) .................................................................... 16

*White v. Samsung Elecs. Am., Inc.,*
971 F.2d 1395 (9th Cir. 1992) .................................................... 23

*Zacchini v. Scripps-Howard Broad. Co.,*
433 U.S. 562 (1977) .................................................................... 19, 20

**<u>Statutes</u>**

*Cal. Civ. Code § 3344* ........................................................................ 8, 16

**TABLE OF AUTHORITIES** *(continued)*

<u>**Page(s)**</u>

*Cal. Code Civ. Proc. § 425.16* ................................................................... 8

<u>**Other Authorities**</u>

David Kohler, *At The Intersection of Comic Books and Third World Working Conditions: Is it Time to Re-Examine the Role of Commercial Interests in the Regulation of Expression?*, 28 Hastings Comm. & Ent. L.J. 145 (2006) ...................................... 17

John Branch, *Snow Fall: The Avalanche at Tunnel Creek*, N.Y. Times, fttp://www.nytimes.com/projects/2012/snow-fall/#/?part=tunnel-creek (last visited Feb. 19, 2016). ................................. 11

Linda J. Stack, Note, *White v. Samsung Electronics America, Inc.'s Expansion of the Right of Publicity: Enriching Celebrities at the Expense of Free Speech*, 89 Nw. U. L. Rev. 1189 (1995). .......................... 23

Tara E. Langvardt, *Reinforcing the Commercial-Noncommercial Distinction: A Framework for Accommodating First Amendment Interests in the Right of Publicity*, 13 Va. Sports & Ent. L.J. 167 (2014). ........................................................................................ 16

<u>**Treatises**</u>

Erwin Chemerinsky, *Constitutional Law: Principles and Policies* (4th ed. 2011) .................................................................................... 12

## RULE 29(C)(5) CERTIFICATION

Pursuant to Fed. R. App. P. 29(c)(5), *amici* states that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

## CORPORATE DISCLOSURE STATEMENTS

The parties to this amicus brief are: The Reporters Committee for Freedom of the Press, American Society of News Editors, Association of Alternative Newsmedia, Association of American Publishers, Inc., The E.W. Scripps Company, First Amendment Coalition, First Look Media Works, Inc., Freedom of the Press Foundation, GateHouse Media, LLC, International Documentary Assn., Investigative Reporting Workshop at American University, Los Angeles Times Communications LLC, The McClatchy Company, MPA – The Association of Magazine Media, National Newspaper Association, The National Press Club, National Press Photographers Association, Newspaper Association of America, North Jersey Media Group Inc., Online News Association, Radio Television Digital News Association, Society of Professional Journalists, and the Tully Center for Free Speech.

Pursuant to Fed. R. App. P. 26.1, *amici* disclose as follows:

1

The Reporters Committee for Freedom of the Press certifies that it is an unincorporated nonprofit association with no parent corporation and no stock.

American Society of News Editors is a private, non-stock corporation that has no parent.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

First Look Media, Inc. is a non-profit non-stock corporation organized under the laws of Delaware. No publicly-held corporation holds an interest of 10% or more in First Look Media, Inc.

Freedom of the Press Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of the organization.

GateHouse Media, LLC is a for-profit Delaware limited liability company ("GateHouse Media"). Ultimate Parent Company (indirect): GateHouse Media is an indirect wholly-owned subsidiary of New Media Investment Group Inc., a

Delaware corporation and New York Stock Exchange publicly-traded company. Parent Company (indirect): GateHouse Media is an indirect wholly-owned subsidiary of New Media Holdings I LLC, a Delaware limited liability company (New Media Holdings I LLC is a direct wholly-owned subsidiary of New Media Investment Group Inc.). Parent Company (direct): GateHouse Media is a direct wholly-owned subsidiary of New Media Holdings II LLC, a Delaware limited liability company (New Media Holdings II LLC is an indirect wholly-owned subsidiary of New Media Investment Group Inc.)

The International Documentary Association is an non-for-profit organization with no parent corporation and no stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization affiliated with the American University School of Communication in Washington. It issues no stock.

Los Angeles Times Communications LLC is a subsidiary of Tribune Publishing Company. Tribune Publishing Company is publicly held. Oaktree Tribune, L.P. owns 10 percent or more of Tribune Publishing Company's stock.

The McClatchy Company is publicly traded on the New York Stock Exchange under the ticker symbol MNI. Contrarius Investment Management Limited owns 10% or more of the common stock of The McClatchy Company.

MPA – The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

National Newspaper Association is a non-stock nonprofit Missouri corporation. It has no parent corporation and no subsidiaries.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Newspaper Association of America is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

North Jersey Media Group Inc. is a privately held company owned solely by Macromedia Incorporated, also a privately held company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

4

The Tully Center for Free Speech is a subsidiary of Syracuse University.

## SOURCE OF AUTHORITY TO FILE BRIEF

Pursuant to Fed. R. App. 29(a), all parties to this appeal have given consent for *amici* to file this brief. *See also* Ninth Circuit Advisory Committee Note to Rule 29-3.

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici,* all of whom are engaged in newsgathering or represent the interests of journalists and publishers, have an interest in seeing that their First Amendment rights are fully protected when courts evaluate "right of publicity" claims. Journalists and authors should be free to communicate matters of public interest without fear that they could be sued by the subject of a news story. Whatever publicity rights an individual may have, that right should be no stronger than, nor should they invalidate, a journalist's or a member of the general public's First Amendment right of free expression.

The Reporters Committee for Freedom of the Press ("Reporters Committee") is joined in this brief by American Society of News Editors, Association of Alternative Newsmedia, Association of American Publishers, Inc., The E.W. Scripps Company, First Amendment Coalition, First Look Media Works, Inc., Freedom of the Press Foundation, GateHouse Media, LLC, International Documentary Assn., Investigative Reporting Workshop at American University, Los Angeles Times Communications LLC, The McClatchy Company, MPA – The Association of Magazine Media, National Newspaper Association, The National Press Club, National Press Photographers Association, Newspaper Association of America, North Jersey Media Group Inc., Online News Association, Radio Television Digital News Association, Society of Professional Journalists, and the

Tully Center for Free Speech.  Descriptions of all parties to this brief are given more fully in Appendix A.

## INTRODUCTION

*Amici*, filing in support of Defendant-Appellee T3Media, Inc. ("T3Media"), urge this Court to uphold the district court's order granting T3Media's Special Motion to Strike under California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16, and dismissing the action with prejudice.

Plaintiffs, purportedly acting on behalf of a putative class, assert that T3Media violated their rights of publicity under Cal. Civ. Code § 3344 and the California Common Law. *See* FAC at 20-22, June 6, 2014, ECF No. 1.[1] The claims arose after T3Media operated, with the approval of the National Collegiate Athletic Association ("NCAA"), Paya.com—a website that allowed members of the public to view and purchase non-exclusive licenses to photographs copyrighted by the NCAA ("the NCAA Photo Library"). *Maloney v. T3Media, Inc.*, 94 F. Supp. 3d 1128, 1121-32 (C.D. Cal. 2015). The NCAA Photo Library contains thousands of photographs spanning more than 70 years, and includes photos from 89 NCAA championship games across 23 sports. *Id.* at 1132 (citing Ernest Weiser Declaration, Dkt. No. 36-1, ¶ 5). Photographs of the Plaintiffs from when they

---

[1] Plaintiffs also assert that T3Media violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, a claim that will not be specifically addressed in this brief.

were members of the 2001 Catholic University Men's Division III Championship team are included within the NCAA Photo Library. *Id.* at 1131-32.

The district court granted T3Media's Special Motion to Strike under California's anti-SLAPP statute on the ground that the Copyright Act preempted Plaintiffs' claims. *Id.* at 1140. In dismissing the action, the district court found it unnecessary to discuss T3Media's affirmative defense that the First Amendment barred Plaintiffs' claims. *Id.*

As representatives of the news media and others who produce First Amendment-protected expressive works, *amici* write separately to emphasize the importance of this case from a First Amendment perspective and to stress that the significance of this action extends well beyond the facts presented. *Amici* have a strong interest in ensuring that the right of publicity is not transformed into a right of censorship—one that can be used to prevent the dissemination of matters of public importance. The scope of the right of publicity must be properly limited to ensure that the expressive activity protected by the First Amendment is not curtailed in order to give individuals undue control over any reproduction of their likenesses. Doing otherwise stands to hinder the ability of the news media and the publishing industry to report on matters of public concern.

## SUMMARY OF ARGUMENT

The images contained in the NCAA photo library portray a myriad of ideas and emotions and do far more than propose a commercial transaction. They thus constitute fully protected speech under the First Amendment to the United States Constitution. Accordingly, Plaintiffs cannot restrict the dissemination of the photos without showing a narrowly tailored compelling state interest—a standard they cannot satisfy by asserting publicity rights.

Further, the First Amendment is not, as advocates of publicity rights contend, a narrow exception to the right of publicity. Rather, the opposite is true. The right of publicity is best viewed as a doctrine designed to prevent the unauthorized use of an individual's name or likeness in connection with the advertisement of a product. Extending this doctrine outside the realm of commercial speech stands to infringe upon the First Amendment freedoms of the news media and the creators of other protected works as well as the public.

## ARGUMENT

With each passing year, the news media becomes less traditional, finding new ways to inform readers. Decades ago it would have been unthinkable that a news organization would "tweet" out a news story in 140-characters or less, solely post photographs on a website like Instagram, or actively provide avenues to develop user-generated content. Indeed, as seen in *The New York Times'* "Snow

Fall"—an interactive feature article that combines text, historic photographs, breathtaking video, and informative graphics—the news media is constantly developing new methods of story telling.[2]  These new approaches to providing compelling and informative journalism to the public may increase the risk that members of the news media will become the subject of a right of publicity suit.

To negate this increased danger, it is incumbent upon the courts to continue to apply the First Amendment to defeat novel theories of liability.  Failure to do so stands to negatively affect American democracy, for an "'untrammeled press [is] a vital source of public information,' . . . and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (quoting *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)).  Thus, when addressing rights of publicity claims involving speech entitled to the full protection of the First Amendment, courts must apply the most exacting form of judicial review (i.e., strict scrutiny) in an effort to ensure that First Amendment freedoms remain robust.

---

[2] *See* John Branch, *Snow Fall: The Avalanche at Tunnel Creek*, N.Y. Times, fttp://www.nytimes.com/projects/2012/snow-fall/#/?part=tunnel-creek (last visited Feb. 19, 2016).

I.    **The photographs should receive full First Amendment protection, with any restrictions subject to strict scrutiny.**

Noncommercial speech on matters of public interest, as a default, receives the full protection of the First Amendment, and any content-based regulations placed on such speech "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citing *R.A.V. v. St. Paul*, 505 U. S. 377, 395 (1992); *Simon & Schuster, Inc.* v. *Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991)); *see also* Erwin Chemerinsky*, Constitutional Law: Principles and Policies* 960 (4th ed. 2011) ("The Supreme Court frequently has declared that the very core of the First Amendment is that the government cannot regulate speech based on its content.").

Content-based regulations on speech are disfavored because they "have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004) (citing *R.A.V.*, 505 U.S. at 382). Accordingly, content-based regulations have generally been permitted in only a few specifically identified categories of speech, including (1) advocacy intended, and likely, to incite imminent lawless action; (2) obscenity; (3) defamation; (4) speech integral to criminal conduct; (5) fighting words; (6) child pornography; (7) fraud; (8) true threats; and (9) speech that presents a grave and

imminent threat the government has the power to prevent. *United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (citations omitted).

Because of the foregoing, it becomes crucial to identify when a regulation is content based, as opposed to one that is content neutral. A regulation is content-based when it "target[s] speech based on its communicative content . . . ." *Reed*, 135 S. Ct. at 2226; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994) ("[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based."). In contrast, regulations "that confer benefits or impose burdens on speech without reference to the ideas or viewpoints expressed are in most instances content-neutral." *Turner*, 512 U.S. at 643.[3]

Commercial speech, when compared to noncommercial speech, generally receives less protection under the First Amendment. *See Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566 (1980) (writing that commercial speech that concerns a lawful activity and is not misleading is subject to intermediate scrutiny). The U.S. Supreme Court has defined commercial speech as "communication which does no more than propose a commercial transaction."

---

[3] Contrary to content-based regulations, which are subject to strict scrutiny, content-neutral regulations are subject to intermediate scrutiny. *Turner*, 512 U.S. at 642.

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 776 (1976). It has further listed three considerations when categorizing such speech: (1) whether the speech is an advertisement; (2) whether the speech refers to a specific product; and (3) whether the speaker has an economic motivation for the speech. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66 (1983).

### A. The photographs contained in the NCAA photo library should be classified as First Amendment-protected noncommercial speech.

It is beyond dispute that photographs, as a general matter, are entitled to protection under the First Amendment. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569 (1995) ("[T]he Constitution looks beyond written or spoken words as mediums of expression."); *Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996) ("Visual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection."). This is because "[t]he protection of the First Amendment is not limited to written or spoken words, but includes other mediums of expression, including music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures." *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003).

It is also clear that the images contained within the NCAA photo library fall within the realm of noncommercial speech. At the outset, photographs of NCAA

student athletes do far more than merely "propose a commercial transaction."

Sports photographs typically portray a variety of ideas and emotions, as athletes

grapple with themes of teamwork and sportsmanship as they experience victory

and defeat. In the context of the photographs of the Plaintiffs, T3Media reports

that the images depict an historic event for Catholic University—its first, and to

date only, NCAA title. Def.'s Supporting Mem. of P. & A. 19, Oct. 24, 2014, ECF

36. Thus, these images undoubtedly do more than propose a commercial

transaction. The images also do not constitute commercial speech under the

*Bolger* test. After all, there is no reason to believe that the photographs constitute

an advertisement, nor any indication that the images refer to a consumer product.

The mere fact that T3Media may earn a profit from licensing the photos in

the NCAA photo library does not transform the images into commercial speech.

*See Va. State Bd. of Pharmacy*, 425 U.S. at 761 ("[S]peech does not lose its First

Amendment protection because money is spent to project it" or because "it is

carried in a form that is 'sold' for profit . . . even though it may involve a

solicitation to purchase or otherwise pay or contribute money." (citations

omitted)); *see also Joseph Burstyn v. Wilson*, 343 U.S. 495, 501 (1952) ("That

books, newspapers, and magazines are published and sold for profit does not

prevent them from being a form of expression whose liberty is safeguarded by

the First Amendment."); *Dryer v. Nat'l Football League*, No. 14-3428, slip op. at 7

15

(8th Cir. Feb. 26, 2016) (concluding that because historic films created by the NFL constitute "speech of independent value and public interest rather than advertisements for a specific product, the NFL's economic motivations alone cannot convert these productions into commercial speech."). Any profit motive underscoring noncommercial speech is dwarfed by the speech's "informative, entertainment and educational aspects." Tara E. Langvardt, *Reinforcing the Commercial-Noncommercial Distinction: A Framework for Accommodating First Amendment Interests in the Right of Publicity*, 13 Va. Sports & Ent. L.J. 167, 175 (2014).

**B.      Right of publicity laws are content-based restrictions on speech subject to strict scrutiny, a standard the Plaintiffs cannot overcome.**

Under the Supreme Court's 2015 decision in *Reed*, right of publicity laws are content-based restrictions on speech because they "target speech based on its communicative content . . . ." 135 S. Ct. at 2226. California's law, for instance, meets this standard by singling out (and prohibiting) an individual's knowing use of "another's name, voice, signature, photograph, or likeness, in any manner . . . ." Cal. Civ. Code § 3344(a). Through this targeting, the law permits speech to be disfavored based on the ideas and views contained within that speech. Unlike content-neutral restrictions, which regulate without reference to content, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), right of publicity laws give

16

plaintiffs a governmentally endorsed venue for controlling the messages that may be communicated about them.

The Ninth Circuit recognized this principle earlier this month in *Sarver v. Chartier*, No. 11-56986, 2016 U.S. App. LEXIS 2664 (9th Cir. Feb. 17, 2016). *Sarver* involved a right of publicity claim brought by Army Sergeant Jeffrey Sarver against the makers of the film *The Hurt Locker*.  Sarver asserted that the film's principal character was based on his experiences as an Explosive Ordnance Disposal technician in Iraq.  *Id.* at *4-6.  In addition to finding that *The Hurt Locker* constituted fully protected speech under the First Amendment, the court concluded that "California's right of publicity law clearly restricts speech based upon its content."  *Id.* at *24; *see also Frazier v. Boomsma,* No. 07-8040-PHX-NVW, 2007 U.S. Dist. LEXIS 72427 at *37 (D. Ariz. Sept. 27, 2007) (deeming an Arizona law that provided for criminal penalties for the unauthorized commercial uses of an American soldier's name a content-based restriction); David Kohler, *At The Intersection of Comic Books and Third World Working Conditions: Is it Time to Re-Examine the Role of Commercial Interests in the Regulation of Expression?*, 28 Hastings Comm. & Ent. L.J. 145, 186 (2006) ("The right of publicity is, of course, a content-based law; its coverage is defined precisely in terms of the subject matter of the speech it seeks to restrict.").

As a content-based restriction, right of publicity laws when applied to noncommercial speech must be subject to strict scrutiny. *See Sarver*, 2016 U.S. App. LEXIS 2664 at *30 (writing that, as a content-based regulation on speech, California's right of publicity law is "presumptively unconstitutional, and cannot stand unless Sarver can show a compelling state interest in preventing the defendants' speech"). Under this standard, although "[t]he right of publicity can warrant content-based restrictions on commercial speech," it "cannot justify content-based restrictions on political or artistic expression where the identity of the holder of the right bears a reasonable relationship to the message." *Frazier*, 2007 U.S. Dist. LEXIS 72427 at *42 (citations omitted).

This should hardly be surprising considering that publicity interests cannot be deemed a compelling interest sufficient to overcome another's First Amendment right to communicate a matter of public concern. *See Sarver*, 2016 U.S. App. LEXIS 2664 at *30 (concluding that the Plaintiff could not "show a compelling state interest in preventing the defendants' speech"). Speech of a public concern is speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community," *Connick v. Myers*, 461 U.S. 138, 146 (1983), or speech that is a "subject of general interest and of value and concern to the public," *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).

Photographs that depict important sporting events clearly constitute a matter of public concern, as the California courts have repeatedly stressed. In *Gionfriddo v. Major League Baseball*, the California Fourth District Court of Appeal found that because professional baseball "is followed by millions of people across this country on a daily basis," information about baseball players is of "a substantial public interest and, therefore, is a form of expression due substantial constitutional protection." 94 Cal. App. 4th 400, 411 (2001) (citations omitted). Likewise, in *Montana v. San Jose Mercury News*, the same appellate court declared that newspaper accounts of Super Bowl victories "constituted publication of matters in the public interest . . . ." 34 Cal. App. 4th 790, 794 (1995). In holding that the First Amendment protected a newspaper's action of recreating newspaper pages chronicling the victories in poster form (posters that were sold to the general public), the court noted that "the posters themselves report newsworthy items of public interest . . . ." *Id.* at 797.

The U.S. Supreme Court's sole ruling in a right of publicity case, *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), does not demand a different outcome. In *Zacchini*, the Court issued a narrow holding that declared the First Amendment did not immunize a television station from liability for a publicity suit after the station broadcast performer Hugo Zacchini's entire human

cannonball act on a news program.[4]  *Id.* at 575.  Central to the Court's decision was the fact that the station filmed and subsequently displayed Zacchini's *entire act*. "The broadcast of a film of petitioner's entire act," the Court wrote, "poses a substantial threat to the economic value of that performance."  *Id.*  Indeed, the Court strongly suggested that the outcome would have been different if, instead of broadcasting the entire act, the television station had used Zacchini's picture and merely described the performance.  *Id.* at 569.

In this case, T3Media has not done what the Court disapproved of in *Zacchini*—broadcast an entire live performance.  Rather, T3Media has merely used Plaintiffs' pictures as evidence of a historic sporting event—an action the Court in *Zacchini* seemingly sanctioned.  *Zacchini's* narrow holding is thus inapplicable. *See also Cox v. Hatch*, 761 P.2d 556, 563 (Utah 1988) (stating that "[w]hile a person may have a legitimate interest in protecting his or her personal identity from exploitation by others, that interest is minimal when the person allows his picture to be taken in a public or semi-public place," and writing that individuals who have pictures taken of them in public "do not have a privacy interest that can prevail against the First Amendment informational interest").

---

[4] The act, which lasted approximately 15 seconds, featured Zacchini being shot from a cannon and into a net roughly 200 feet away.  *Id.* at 263.

The Ninth Circuit's observation in *Sarver* "that speech which . . . appropriates the economic value of a performance or persona . . . is unprotected by the First Amendment" further supports T3Media. *Sarver*, 2016 U.S. App. LEXIS 2664 at *29. In the section of the opinion in which this reflection appears, the Ninth Circuit makes clear that its concern is with the appropriation of a performance or persona on merchandise. This is why the court references *Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010)—a case in which the Ninth Circuit ruled that celebrity Paris Hilton could pursue a publicity suit against Hallmark Cards after the company, without Hilton's permission, used her image and catchphrase in a birthday card.

"The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . .'" *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Adopting Plaintiffs' approach would cut against this "profound national commitment" by allowing speech on important matters of public concern to be censored by those seeking to merely control their images. *Id.*

## II. The right of publicity is a narrow exception to the First Amendment, not *vice versa*.

The First Amendment is not a narrow exception to the right of publicity. To the contrary, the freedoms secured by the First Amendment are presumed to apply

to protect expressive activity, and the right of publicity—when properly applied as a limit on use of a person's image as a commercial endorsement—is a narrow exception to such freedoms.[5]

*Amici* do not dispute that the right of publicity may legitimately be used to prevent one's name or likeness from being associated with the advertisement of a product. *See, e.g.*, *Midler v. Ford Motor Co.*, 849 F. 2d 460 (9th Cir. 1988); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992). In these cases, advertisers used sound-alikes to invoke the image of a celebrity singer to sell their product—automobiles in the *Midler* case and corn chips in the *Waits* case. Consumers could reasonably believe that the singers were endorsing the product, or at least participating in the production of the advertisement, even though the individual had nothing to do with the advertisement. Such false implications may be barred by the

---

[5] Many courts have recognized the priority of First Amendment rights. *See, e.g.*, *Valentine v. CBS, Inc.*, 698 F.2d 430 (11th Cir. 1983) (a statute that broadly prohibits the use of a person's name or likeness raises grave constitutional concerns); *Ann-Margret v. High Society Magazine, Inc.*, 498 F. Supp. 401 (S.D.N.Y. 1980) (the First Amendment transcends the right of publicity); *Current Audio, Inc. v. RCA Corp.*, 337 N.Y.S.2d 949 (NY App. 1972) (the First Amendment supersedes any private pecuniary interest; attempting to control the use of a person's name or likeness would constitute an impermissible restraint on free expression); *Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501, 506 (NY App. 1968) (any right of publicity must be construed in light of the primacy of constitutional protections for speech and press); *Rosemont Enter., Inc. v. Random House, Inc.*, 294 N.Y.S.2d 122 (NY App. 1968) (there are definite limits on the right of publicity; namely, it applies only to advertising and not to expressive works protected by the First Amendment).

right of publicity because the First Amendment has not been held to protect fraudulent commercial endeavors. *See Cent. Hudson*, 447 U.S. at 566; *see also Sarver*, 2016 U.S. App. LEXIS 2664 at *29 ("[O]ur precedents have held that speech which . . . seeks to capitalize off a celebrity's image in commercial advertisements is unprotected by the First Amendment against a California right-of-publicity claim.").

Nevertheless, allowing the right of publicity in such contexts does not require extending the right to cover all uses of an individual's name, likeness, or image. To do so would infringe upon the First Amendment rights of others to comment upon or simply distribute information about a person. Even copyright law, which is mandated and protected in our Constitution, does not purport to go so far. *See Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 556 (1985) ("No author may copyright his ideas or the facts he narrates."). In fact, *White v. Samsung Elecs. Am., Inc.*, a California case that popularized the notion of a broad right of publicity,[6] acknowledges that the right should be limited to use in advertisements. 971 F.2d 1395 (9th Cir. 1992). As the court put it:

---

[6] *See generally* Linda J. Stack, Note, *White v. Samsung Electronics America, Inc.'s Expansion of the Right of Publicity: Enriching Celebrities at the Expense of Free Speech*, 89 Nw. U. L. Rev. 1189 (1995).

> This case concerns only the market which exists in our society for the exploitation of celebrity to sell products, and an attempt to take a free ride on a celebrity's celebrity value. Commercial advertising which relies on celebrity fame is different from other forms of expressive activity . . . .

*Id.* at 1401 n.3.

Recognizing a broad right of publicity, as Plaintiffs want this court to do, would create confusion among the news media and artists and would end up chilling free expression. One who lives in fear of being sued for violating another's right of publicity may decide not to communicate at all. This would be a troubling scenario of constitutional dimension, as the First Amendment right of free expression should never be subordinated to an individual's pecuniary interests. This Court should thus uphold the tradition of protecting free expression.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to uphold the district court's ruling.

Respectfully submitted,

s/ Bruce D. Brown
Bruce D. Brown
*Counsel of record for amicus curiae*
Gregg P. Leslie
The Reporters Committee for Freedom of the Press

24

## **STATEMENT OF RELATED CASES**

Undersigned counsel is unaware of any related cases.


Dated:  February 26, 2016

s/   Bruce D. Brown
Bruce D. Brown
*Counsel of Record for amicus curiae*
The Reporters Committee for Freedom of
the Press

## Appendix A: Statements of Interest

With some 500 members, American Society of News Editors ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

The Association of American Publishers, Inc. ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies. AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary and professional markets, scholarly journals, computer software and electronic products and services. The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

The E.W. Scripps Company serves audiences and businesses through television, radio and digital media brands, with 33 television stations in 24 markets. Scripps also owns 34 radio stations in eight markets, as well as local and national digital journalism and information businesses, including mobile video news service Newsy and weather app developer WeatherSphere. Scripps owns and operates an award-winning investigative reporting newsroom in Washington, D.C. and serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling Bee.

First Amendment Coalition is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission

assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

First Look Media, Inc. is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

Freedom of the Press Foundation is a non-profit organization that supports and defends public-interest journalism focused on transparency and accountability. The organization works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including public advocacy, legal advocacy, the promotion of digital security tools, and crowd-funding.

GateHouse Media is a preeminent provider of print and digital local content and advertising in small and midsize markets. Our portfolio of products, which includes 404 community publications and more than 350 related websites and six yellow page directories, serves over 128,000 business advertising accounts and reaches approximately 10 million people on a weekly basis.

The International Documentary Association (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

The Investigative Reporting Workshop, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

Los Angeles Times Communications LLC publishes the Los Angeles Times, the largest metropolitan daily newspaper in the country. The Los Angeles Times operates the website www.latimes.com, a leading source of national and international news.

The McClatchy Company, through its affiliates, is the third-largest newspaper publisher in the United States with 29 daily newspapers and related websites as well as numerous community newspapers and niche publications.

MPA – The Association of Magazine Media, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

National Newspaper Association is a 2,400 member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Columbia, Missouri.

The National Press Club is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

Newspaper Association of America ("NAA") is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada. NAA members account for nearly 90% of the daily newspaper circulation in the United States and a wide range of non-daily newspapers. The Association focuses on the major issues that affect today's newspaper industry, including protecting the ability of the media to provide the public with news and information on matters of public concern.

North Jersey Media Group Inc. ("NJMG") is an independent, family-owned printing and publishing company, parent of two daily newspapers serving the residents of northern New Jersey: The Record (Bergen County), the state's second-largest newspaper, and the Herald News (Passaic County). NJMG also publishes

more than 40 community newspapers serving towns across five counties and a family of glossy magazines, including (201) Magazine, Bergen County's premiere magazine. All of the newspapers contribute breaking news, features, columns and local information to NorthJersey.com. The company also owns and publishes Bergen.com showcasing the people, places and events of Bergen County.

Online News Association ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

**<u>CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R.
APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE
NUMBER 15-55630</u>**

I certify that this brief complies with the length limits set forth at Ninth Circuit Rule 32-1.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).  Pursuant to Fed. R. App. P. 32(a)(7)(C), the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 4,279 words.

s/   Bruce D. Brown
Bruce D. Brown
*Counsel of Record for amicus curiae*
The Reporters Committee for Freedom of the Press

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2016, an electronic copy of the foregoing Brief was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit and delivered by operation of the CM/ECF system to the counsel of record.

s/   Bruce D. Brown
Bruce D. Brown
*Counsel of Record for amicus curiae*
The Reporters Committee for Freedom of
the Press